IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

AMY PONZOLI,                          *

    Plaintiff,                    *

vs.                                   *
                                    CASE NO. 3:22-cv-50 (CDL)

TECHNICAL COLLEGE SYSTEM OF          *
GEORGIA d/b/a ATHENS TECHNICAL
COLLEGE,                             *

    Defendant.                    *

_____

O R D E R

Defendant Technical College System of Georgia ("TCSG") employed Plaintiff Amy Ponzoli as the Program Chair for Culinary Arts at Athens Technical College ("ATC"). She claims that TCSG discriminated against her because of her sex and disabilities. She also contends that TCSG retaliated against her for complaining of sex discrimination and for requesting accommodations for her disability. TCSG filed a summary judgment motion as to all of Ponzoli's claims. For the following reasons, the Court grants TCSG's Motion for Summary Judgment (ECF No. 38).

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material*

fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Ponzoli, the record reveals the following facts.  Ponzoli worked for ATC as the Program Chair of the Culinary Arts Department between August 15, 2017 and March 2, 2021.  In that role, she taught culinary arts to students and completed a variety of administrative tasks.  Throughout her tenure with ATC, Ponzoli suffered from hearing loss in both ears and wore hearing aids to assist her hearing while at ATC.[1]

During her employment with ATC, Ponzoli was involved in several disputes with ATC employees, students, and vendors.  These disputes are relevant to the employment actions ATC took against her.  Therefore, the Court describes them below.  The Court refers

---

[1] In November 2019, Ponzoli discussed her hearing loss with then-ATC Human Resources Director Becky Burton, who provided her with an accommodation form; Ponzoli did not pursue an accommodation at that time, however.

to those persons who are not employees of ATC or TCSG by their initials to protect their privacy as much as reasonable.

## I.   Ponzoli's Disputes with ATC Employees and Vendors

### A.   Lockhart Dispute

Beginning in March 2018, Ponzoli developed a difficult working relationship with Chris Lockhart, who worked as ATC Walton County Campus's head of maintenance. Lockhart did not supervise Ponzoli or set the conditions of her employment. In July 2020, Lockhart worked with Jason Cobb, another chef in the culinary department, to repair one of the department's freezers. Ponzoli found Lockhart and Cobb discussing the issue and waved her arms to be acknowledged by them, but Lockhart said that he was talking to Cobb, not Ponzoli. Lockhart reported this incident to his supervisor, Jim Walter, who then reported it to his supervisor, Vice President Kathryn Thomas, and Ponzoli's direct supervisor, Dean Nick Chapman. On July 13, 2020, Chapman and Vice President Glenn Henry, whom Chapman reported to, met with Ponzoli to discuss professional workplace behavior—the meeting established that Ponzoli should tell Chapman about any future concerns with Lockhart. Lockhart and Ponzoli rarely interacted in-person; Ponzoli never recalled Lockhart using gender-based or profane language with her, engaging in unwanted physical touching, or verbally threatening her.

Ponzoli believed that Lockhart treated male faculty members differently than female faculty members, which she attributed to her sex.  Ponzoli Dep. 55:2-59:5, ECF No. 36.  On July 20, 2020, Ponzoli filed a formal sex discrimination complaint against Lockhart with ATC's human resources office.  TCSG's Title IX Coordinator, Brannon Jones, investigated the complaint, but concluded that the conflict between Ponzoli and Lockhart stemmed from "conflicting personalities," not sex discrimination.  Jones Report of Investigation 6, ECF No. 36-9 at 8.  While Jones investigated Ponzoli's sex discrimination complaint, Ponzoli filed a complaint alleging that she faced retaliation for filing her sex discrimination complaint; specifically, Ponzoli claimed that her department "was under a microscope" following her complaint.  Ponzoli Dep. 97:1-2.  Jones also investigated this retaliation complaint and determined that Ponzoli had not been retaliated against because of her sex discrimination complaint.  Following these investigations, Ponzoli and Lockhart did not have any substantial relationship.

B.   R.M. Dispute

In September 2020, Lenzy Reid, the Executive Director of ATC's Walton County Campus, received a complaint regarding an interaction between Ponzoli and R.M., a fire safety technician from Metro Fire & Safety who inspected fire extinguishers at ATC's Walton County Campus.  According to R.M.'s complaint, Ponzoli

"berate[d]" R.M. in an "angry manner" after he did not consult her before going into the kitchen.  R.M. Compl. 1, ECF No. 29-26.  A different staff member corroborated that complaint, stating that Ponzoli was "very unprofessional" with R.M. by "completely ignor[ing] him and talk[ing] over him aggressively" when he "tried to explain to her the reason for the issue."  Compiled Documents 31, ECF No. 29-4.  After this incident, R.M. "was uncomfortable" inspecting the kitchen by himself.  *Id.*  After soliciting Ponzoli's perspective of the encounter, Henry formally disciplined her for "[u]nprofessional conduct and interaction with an outside vendor" because of her September 2020 interaction with R.M.  *Id.* at 35; *see* TCSG Positive Discipline Procedure 2, ECF No. 29-10 (describing the discipline that Ponzoli received (a "Reminder 1") as the "first formal step in the disciplinary process").

C.   Flynt Dispute

In December 2020, Ponzoli entered the office of Fabersha Flynt, then-Campus Coordinator for ATC's Walton Campus, because she "was just frustrated" that a student—M.B.—reenrolled in a course she had already passed, thus taking a spot away from other students who needed to take the course "to graduate on time."  Ponzoli Dep. 115:14-118:21.  Flynt said Ponzoli entered her office "very agitated and there was no knock on the door."  Flynt Dep. 23:22-25, ECF No. 33.  Ponzoli called M.B. "a bored housewife."  Ponzoli Dep. 118:23-24.  After this encounter, Flynt filed a

complaint to her supervisor, Jennifer Benson, who forwarded the complaint to Sherri Heath, then-ATC Human Resources Director. Reid ultimately received the complaint and investigated the incident. Benson sent Reid a statement about the encounter, in which Benson shared that Flynt "was concerned about Chef Ponzoli's 'rude behavior' and didn't think it was right." Def.'s Mot. Summ. J. Ex. 24, Benson Statement 2, ECF No. 38-27. Benson told Reid that, until Benson filed the statement, she had "not been told that Chef Ponzoli had yelled or behaved in a manner other than upset and agitated. Based on what [Benson had] first hand witnessed of Chef Ponzoli, upset and agitated is her baseline. Personally [Benson had] seen her curse, but not in front of students." *Id.* at 3.

Around this time, M.B.'s husband texted Chef Cobb about Ponzoli's behavior: he complained that M.B. had "received yet another communication from Chef Ponzoli" questioning why M.B. was taking the class. Def.'s Mot. Summ. J. Ex. 25, Text Message 3, ECF No. 38-28. M.B.'s husband characterized Ponzoli's communications with M.B. as "bordering now on harassment." *Id.* Thereafter, at Dean Chapman's request, Ponzoli agreed not to contact M.B. unless Henry approved it. Def.'s Mot. Summ. J. Ex. 22, Email from A. Ponzoli to G. Henry 1 (Dec. 15, 2020, 11:46 AM), ECF No. 38-25. In January 2021, Heath and Henry met with Ponzoli and Cobb to discuss the Flynt incident. Heath reiterated to them that they must act professionally and "that any retaliation against

any student or employee is prohibited and would result in disciplinary action."  Compiled Documents at 45-46.

## II.  Student Complaints, Disciplinary Hearing, and Termination

In February 2021, M.B. complained to Cobb that Ponzoli continued to contact her regarding her reenrollment in the class: Ponzoli "was offended that [M.B. and another student] would want to retake the class and was very argumentative."  Def.'s Mot. Summ. J. Ex. 34, M.B. February 2021 Email Exchange 2, ECF No. 38-37. Another student, A.D. also complained about "inappropriate behavior in the Culinary Arts Department."  Def.'s Mot. Summ. J. Ex. 35, A.D. February 2021 Email Exchanges 3, ECF No. 38-38.  A.D. expressed that "obvious tension" existed between Cobb and Ponzoli and that they both "curse[d] students."  *Id.* at 1.

On February 16, 2021, Ponzoli met with Heath, Henry, Reid, and Chapman to address the complaints involving R.M., Flynt, and the students.  Email from A. Ponzoli to S. Heath 2 (Feb. 18, 2021, 8:25 AM), ECF No. 29-19 (describing the subject matter of the meeting).  On February 12, 2021, in anticipation of this meeting, Ponzoli pursued an accommodation with Heath and requested that, until she provided additional information about her medical condition, that "an unvested, normal hearing person, attend any face to face work meetings" with her and that "any non-emergency conversations take place via email or text" message.  Email from A. Ponzoli to S. Heath 1 (Feb. 12, 2021, 3:41 PM), ECF No. 29-16.

During the meeting with administrators during her disciplinary proceedings, ATC accounted for her hearing loss by removing facemasks, asking Ponzoli to speak up if she had trouble hearing the conversation, and providing an alternative form of communication upon request. But, on February 18, 2021, Ponzoli communicated to Heath that these measures were inadequate. Email from A. Ponzoli to S. Heath 2 (Feb. 18, 2021, 8:25 AM), ECF No. 29-19 (expressing concern that Heath, during the February 16, 2021 disciplinary hearing regarding the student complaints, "did nothing" when Ponzoli asked meeting attendees to "repeat themselves" and never clarified Ponzoli's understanding of the proceedings).

That day, Henry notified Ponzoli that she was being placed on Decision Making Leave. Ponzoli Dep. Ex. 19, Ponzoli Decision Making Leave Letter 1, ECF No. 36-19. Decision Making Leave "is the final step of [TCSG's] discipline process." *Id.* at 2. ATC required Ponzoli to use the following day, February 19, "to make a final decision—either to solve the immediate problem and commit to maintaining fully acceptable performance in every aspect of your job or, instead, to resign and seek employment elsewhere." *Id.* As authorized by TCSG's disciplinary policy, Ponzoli requested a review of that decision with ATC President Dr. Andrea Daniel, who ultimately determined that Decision Making Leave was warranted. TCSG Positive Discipline Procedure 8 (stating that an

"employee placed on a Decision Making Leave may request a review of the action by the President"). Ponzoli returned from Decision Making Leave ready "to follow all the Policies of TCSG, their intentions and examples set forth to explain them and/or reference them.." Ponzoli Dep. Ex. 21, Email from A. Ponzoli to G. Henry 1 (Feb. 22, 2021, 7:46 AM), ECF No. 36-21.

Ponzoli understood that she could not retaliate against students following their complaints and her Decision Making Leave. Ponzoli Dep. 155:16-19. Shortly thereafter, however, ATC officials received complaints from two students—D.P. and A.D.—who both indicated that Ponzoli knew who complained about her and planned to retaliate against them. Def.'s Mot. Summ. J. Ex. 41, Email from D.P. to A. Ponzoli 2 (Feb. 28, 2021, 10:49 PM), ECF No. 38-44 (stating that Ponzoli loudly said in class that she knew who complained about her and that Ponzoli would "show them who" she was); Def.'s Mot. Summ. J. Ex. 42, Email from A.D. to L. Reid (Mar. 1, 2021, 7:08 PM), ECF No. 38-45 (reporting that Ponzoli "said she [knew] who the two are (referring to who complained about her) and she knows what to do (cut their necks)," although recognizing that Ponzoli likely meant lowering their grades). On March 2, 2021, the day after administrators received these complaints, Daniel fired Ponzoli. Daniel testified that, after corroborating statements from multiple students that Ponzoli made statements that could be considered retaliatory, she fired Ponzoli for the

"entire cumulative effect up to that point" of failing to meet expectations.  Daniel Dep. 51:2-8, 52:24-53:15, ECF No. 32.

## III. Post-Termination Events

After being placed on Decision Making Leave but before she was fired, Ponzoli contacted the State Office of the Inspector General ("OIG") because she suspected that ATC would soon fire her in retaliation for making a sexual harassment complaint.  Ponzoli Dep. 136:9-137:17.  On or around the day she was fired, Ponzoli formally filed a complaint with OIG and OIG initiated an investigation.  OIG subsequently issued its report, which did not substantiate Ponzoli's claims: it concluded that the "positive discipline and termination issued by [ATC] was not done in retaliation for [Ponzoli's] filing of a sexual harassment complaint."  Ponzoli Dep. Ex. 26, OIG Report 11, ECF No. 36-26. OIG determined that ATC "followed the applicable TCSG policy on positive discipline and had just cause for disciplining and terminating [Ponzoli] for non-retaliatory reasons."  *Id.*  In June 2021, Ponzoli filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which issued her a right to sue letter in February 2022.

                           DISCUSSION

Ponzoli asserts sex discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and disability discrimination, retaliation,

and failure to accommodate claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.   TCSG moves for summary judgment on all of Ponzoli's claims.   The Court addresses each claim in turn.

## I.   Discriminatory Termination Claims

### A.   Single Motive

Ponzoli claims that TCSG fired her based on her sex and disability.[2]  Where, as here, a plaintiff bases her discrimination claims on circumstantial evidence, the Court applies the familiar *McDonnell Douglas* burden-shifting framework.  *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc) (Title VII); *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1337 (11th Cir. 2022) (Rehabilitation Act).   Under that framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  *Lewis*, 918 F.3d at 1221.   If the plaintiff makes a prima facie case of discrimination, then the burden shifts to the defendant to articulate a legitimate

---

[2] TCSG argues that statements Ponzoli made during discovery render her termination claims abandoned.   Ponzoli Dep. 31:11-25 (testifying that Ponzoli believed that only Lockhart, not anyone else from ATC or TCSG, discriminated against her based on her sex); Pl.'s Answers to Def.'s Interrogs. 10-11, ECF No. 36-1 (omitting any references that TCSG terminated her based on her sex or disability).   But a plaintiff's testimony disclaiming unlawful motivations regarding her termination based on protected categories does not constitute abandonment of her discriminatory termination claims unless the statements unequivocally concede the ultimate issue.  *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1289-90 (11th Cir. 2018).   Here, Ponzoli's testimony and interrogatory responses do not unequivocally concede that discriminatory motivations did not lead to her termination, so the Court considers her sex and disability discriminatory termination claims.

nondiscriminatory reason for the adverse employment action.  *Id.*
If the employer articulates such a reason, then the burden shifts
back to the plaintiff to show that this reason was pretext for
unlawful discrimination.  *Id.*   In the summary judgment context,
the question is whether the plaintiff has created a genuine factual
dispute as to these elements.

For purposes of the pending motions, the Court assumes that
Plaintiff has established a prima facie case for both her sex and
disability discrimination claims.   TCSG has clearly articulated
legitimate,  non-discriminatory  reasons  for  firing  Ponzoli,
specifically her pattern of unprofessional and insubordinate
conduct.  Throughout Ponzoli's tenure at TCSG, employees, vendors,
and students complained about Ponzoli's unprofessional conduct.
TCSG officials investigated and substantiated these complaints.
TCSG progressively disciplined her, but Ponzoli did not comport
with TCSG's expectations and the complaints about Ponzoli's
behavior continued.  When Ponzoli threatened to retaliate against
students who had complained about her conduct, TCSG fired her for
her pattern of uncorrected misbehavior.

Because TCSG articulated nondiscriminatory reasons for its
decision to terminate Ponzoli, the burden shifts back to Ponzoli
to demonstrate that the proffered reasons are not the true reasons,
but instead are a pretext for discrimination.  Ponzoli has failed
to carry this burden.  To establish pretext, a plaintiff must

demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). The plaintiff must rebut the employer's proffered reasons "head on" and cannot succeed by "quarreling with the wisdom" of the reasons. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). A plaintiff cannot show pretext by simply showing that the employer was incorrect in its decision; rather, if the employer honestly believed that the employee engaged in misconduct, even if it was mistaken in such a belief, then the plaintiff's discrimination claim cannot succeed. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *see also Yelling v. St. Vincent's Health Sys.*, No. 21-10017, slip op. at 23, 2023 WL 6474713, at *10 (11th Cir. Oct. 5, 2023) (per curiam) ("An employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason.'" (alteration in original) (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc))). Ultimately, the court's inquiry is "limited to whether the employer gave an honest explanation of its behavior."

13

*Elrod*, 939 F.2d at 1470 (quoting *Mechnig v. Sears, Roebuck, & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)).

In an attempt to carry her burden, Ponzoli challenges the timing of the complaints against her and TCSG's investigation of those complaints.  Regarding timing, Ponzoli suggests that soon after she filed a complaint alleging sex discrimination, TCSG began manufacturing complaints against her in an effort to justify termination.  But the record does not support that contention. Rather, the evidence indicates that Ponzoli's unprofessional and insubordinate behavior escalated in the months following her complaint based on multiple independent reports from outside vendors, staff members, and students.  For example, in September 2020, an outside vendor accused Ponzoli of acting inappropriately during a fire inspection.  Then, in December 2020, an ATC staff member filed a complaint with her supervisor about Ponzoli's unprofessional behavior, including Ponzoli's referring to a student as a "bored housewife."  Ponzoli Dep. 118:23-24.  Cobb also reported that he had received communication from the student's husband that Ponzoli's behavior was "bordering . . . on harassment."  Text Message 3.  After these reports, TCSG counseled Ponzoli regarding its ongoing concerns with her behavior.  Yet, again, in February 2020, a student complained about Ponzoli's inappropriate behavior.  After that complaint, Ponzoli was placed

on Decision Making Leave and upon her return, she stated that she understood that retaliation against students was prohibited.  Less than two weeks after that acknowledgement, however, TCSG received reports that Ponzoli had retaliated or threatened to retaliate against the students who had made those complaints.  Accordingly, the timing of Ponzoli's discipline does not indicate that TCSG's proffered reasons were pretextual; rather, it substantiates TCSG's assertion that it terminated Ponzoli for her pattern of unprofessional and insubordinate behavior.

The Court likewise finds unavailing Ponzoli's contention that TCSG failed to adequately investigate the complaints against her. Specifically, Ponzoli argues that TCSG took the student complaints after her Decision Making Leave at "face value" and that TCSG should have taken further steps to verify the allegations in those complaints.  Even if Ponzoli is correct, her contention does not rebut TCSG's assertion that it honestly believed that Ponzoli had retaliated or threatened to retaliate against the students who had complained about her.  Ponzoli did not point to evidence that TCSG's decisionmakers did not believe the students or were otherwise dishonest about their reasons for terminating Ponzoli. By contrast, TCSG pointed to ample evidence of Ponzoli's pattern of unprofessional and insubordinate behavior, which supported its decision to terminate Ponzoli whether or not it was mistaken that Ponzoli had actually retaliated or threatened to retaliate against

the students who complained about her.  Accordingly, the Court finds that Ponzoli's criticisms of TCSG's investigation do not demonstrate pretext; rather, they amount to a mere disagreement with TCSG's decision to terminate her.

Neither Ponzoli's positive performance reviews nor TCSG's "skipping" steps in its progressive disciplinary policy help her carry her pretext burden.  Although Ponzoli's performance evaluations indicate that she met performance expectations—including in the "professionalism" category—they do not create a jury question as to whether TCSG believed that Ponzoli's unprofessional and insubordinate conduct actually occurred. Ponzoli has produced no evidence that TCSG fabricated the specific incidents that led to its termination of her employment or that it did not believe those incidents occurred.  Additionally, the most recent evaluation is from December 2020—three months before Ponzoli's termination and before multiple students submitted complaints about Ponzoli's unprofessional behavior.  Further, while Ponzoli claims that TCSG skipped steps in its own disciplinary policy by not documenting an informal discussion, TCSG's disciplinary policy provides that the steps "are not required to be followed in sequence."  TCSG Positive Discipline Procedure 7.  In fact, the comparator Ponzoli relies upon to support her prima facie case received discipline after certain

steps were "skipped."   The "skipping of steps" under the circumstances presented here is not evidence of pretext.

In summary, Ponzoli has failed to demonstrate that TCSG's proffered reasons were false and that the real reason for Ponzoli's termination was her sex or disability.   Without a showing that TCSG's termination of her employment was a pretext for unlawful discrimination, her claims fail under the *McDonnell Douglas* analysis.

B.   Convincing Mosaic

Ponzoli argues that even if she did not create a genuine fact dispute on her disparate treatment claims under the *McDonnell Douglas* framework, her claims survive under a convincing mosaic theory.   Ponzoli is correct that failure to establish a genuine fact dispute under the *McDonnell Douglas* framework is not automatically dispositive of her claims.   She may also create a triable fact dispute if the record "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).   "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better

17

treatment of similarly situated employees,' and (3) pretext." *Id.* (quoting *Lewis*, 934 F.3d at 1185).   To support her convincing mosaic theory, Ponzoli points to the same evidence that she argued satisfied *McDonnell Douglas*.   This evidence simply does not raise an inference of discrimination for the reasons explained in the previous discussion.[3] *See Ossman v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023) (explaining the similarity between the convincing mosaic inquiry and the final stage of the *McDonnell Douglas* framework).   Accordingly, Ponzoli cannot survive summary judgment based on a convincing mosaic theory.

C. Mixed Motive

Lastly, Ponzoli argues that even if TCSG had legitimate motives for terminating her employment, it also had discriminatory ones. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (laying out the framework for mixed motive claims under Title VII).   But Ponzoli has produced no evidence from which a reasonable jury could conclude that discriminatory intent motivated TCSG at all in its decision to terminate Ponzoli's

---

[3] To the extent Ponzoli argues that TCSG's hiring of three nondisabled male replacements raises an inference of discrimination, the Court rejects that argument.   The Eleventh Circuit recently reaffirmed the principle that hiring replacements outside a plaintiff's protected class may suffice to establish a prima facie case, but such evidence is insufficient to "carry the day" on the ultimate question of intentional discrimination, particularly when the plaintiff does not point to evidence that the decisionmakers were involved in selecting the plaintiff's replacement. *See Ossman v. Meredith Corp.*, 82 F.4th 1007, 1019 (11th Cir. 2023).

employment.   No improper motive evidence exists.   To the extent that Ponzoli asserts a mixed motive claim, it fails as a matter of law.

In summary, the Court grants TCSG's motion for summary judgment on Ponzoli's disparate treatment discriminatory termination claims based on her sex and disability.

## II.  Failure to Accommodate Claim

TCSG also moves for summary judgment on Ponzoli's failure to accommodate claim.   To establish a prima facie case of discrimination based on an employer's failure to accommodate, the employee must show that (1) she has a disability, (2) she is a qualified individual (within the meaning of the Rehabilitation Act), and (3) her employer failed to accommodate her disability. *Owens*, 52 F.4th at 1334.   TCSG concedes that Ponzoli has a disability (her hearing impairment) and that she was qualified for her position.   But it disputes that it failed to accommodate her.

"[T]o trigger an employer's duty to provide a reasonable accommodation, the employee must (1) make a specific demand for an accommodation and (2) demonstrate that such accommodation is reasonable."   *Id.*   "Only after the employee provides this information must the employer 'initiate an informal, interactive process' with the employee to discuss the employee's specific limitations, explore potential accommodations, and select the most appropriate accommodation for both the employer and the employee."

*Id.* (quoting 29 C.F.R. § 1630.2(o)(3)).  The parties agree that Ponzoli first requested an accommodation for her hearing impairment when she asked to be provided with closed captions, a teletypewriter, and an "unvested, normal hearing person" to assist her in disciplinary meetings.  Email from A. Ponzoli to S. Heath 1 (Feb. 12, 2021, 4:41 PM), ECF No. 29-16; Ponzoli Reasonable Accommodation Request Form 2, ECF No. 29-17.  In that request, Ponzoli explained that she was "not able to hear the spoken word easily" in certain settings, including in in-person meetings, and that she was prone to "misunderstanding[s]" in communication. Ponzoli Reasonable Accommodation Request Form 2.  ATC does not seriously dispute that it understood how these proposed accommodations would help Ponzoli overcome any hearing difficulties posed during disciplinary meetings.  *See Owens*, 52 F.4th at 1335 (requiring that employees provide enough information so that an employer can assess how the proposed accommodation would help overcome the limitations presented by the disability).  Nor does it dispute that it was not able to effectively respond to Ponzoli's request.  *See id.* ("The bottom line is that employees must give employers enough information to respond effectively to an accommodation request.").  Accordingly, the Court is satisfied that Ponzoli provided enough information to ATC to trigger its duty to engage in an interactive process.

The next issue is whether TCSG met its obligation to engage in an interactive process with Ponzoli to accommodate potential communication challenges posed by her hearing impairment during disciplinary meetings. Ponzoli contends that TCSG failed to do so when they did not provide her with any of her requested accommodations. The Court disagrees. Although TCSG did not provide Ponzoli with precisely the accommodations she requested, she does not dispute that TCSG took multiple steps to ensure Ponzoli could effectively communicate during disciplinary meetings. For example, TCSG informed Ponzoli that HR Director Heath would act as the "unvested person" at the February disciplinary meeting. Email from S. Heath to A. Ponzoli 1 (Feb. 15, 2021, 3:27 PM), ECF No. 38-47. Further, TCSG provided Ponzoli with the questions it would ask her during the meeting in writing. Finally, ATC officials did not object to the removal of masks during the meetings, asked that Ponzoli speak up if she was having any trouble hearing, repeated themselves when necessary, and had an alternative method of communication available that Ponzoli could request if she needed it. Ponzoli does not seriously dispute that these methods were effective. Indeed, the audio recordings of the meetings demonstrate that she meaningfully participated in the conversation, responded to questions, and vociferously advocated for herself. Accordingly, the Court finds that ATC met its obligation to engage in the interactive process. Summary

judgment is granted in favor of TCSG on Ponzoli's failure to accommodate claim.

## III. Retaliation Claims

In addition to her other claims, Ponzoli brings retaliation claims under Title VII and the Rehabilitation Act, asserting that she was subjected to retaliatory termination. Further, for the first time in her response brief, Ponzoli alleges that she was subjected to a retaliatory hostile environment after she reported that she had been subjected to sex discrimination. The Court addresses each claim in turn.

### A.   Retaliatory Termination

Ponzoli claims that she was terminated in retaliation for her complaint about sex discrimination and her request for an accommodation during her disciplinary proceedings. Retaliation claims under both statutes are governed by the *McDonnell Douglas* burden-shifting framework. *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009) (Title VII); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (explaining that courts "assess ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII"); 29 U.S.C § 794(d) (stating that the "standards used to determine whether" the Rehabilitation Act "has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under" the ADA). The prima facie case for a retaliation

claim requires a showing that (1) Ponzoli engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) the action was causally related to the protected activity. *Bryant*, 575 F.3d at 1307–08.  If she establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse action.  *Id.* at 1308.  To avoid summary judgment, Ponzoli must then point to sufficient evidence to create a genuine factual dispute that TCSG's articulated reason was pretextual.  *Id.*

The Court is not convinced that Ponzoli established a genuine fact dispute that her termination was caused by her engagement in statutorily protected activity—as opposed to the students' complaints of her unprofessional misconduct.  But even if she did establish a prima facie case of Title VII or Rehabilitation Act retaliation, Ponzoli did not produce evidence that TCSG's legitimate, nonretaliatory reasons for firing her were a pretext for unlawful retaliation.  As explained in the Court's discussion above, no reasonable jury could find that TCSG's reasons for terminating Ponzoli were pretextual.  Because Ponzoli has failed to create a genuine factual dispute as to whether TCSG's termination of her was a pretext for unlawful retaliation, TCSG is entitled to summary judgment on Ponzoli's Title VII and Rehabilitation Act retaliation claims.

B.   Retaliatory Hostile Work Environment

In addition to her retaliatory termination claims, Ponzoli contends that she was subjected to a retaliatory hostile work environment after she reported that she had been subjected to sex discrimination after the Lockhart incident.  Ponzoli raised this argument for the first time in her brief in response to TCSG's summary judgment motion.  Her operative complaint, however, does not include a retaliatory hostile work environment claim, and she may not amend her complaint in her response brief.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam).  Even if Ponzoli had pleaded a retaliatory hostile work environment claim, the evidence she cited in her response brief does not create a genuine fact dispute on that claim.  To establish a retaliatory harassment claim, a plaintiff must demonstrate that she engaged in a statutorily protected activity, that the conduct complained of "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," and a causal link between the alleged conduct and the protected activity.  *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1207 (11th Cir. 2021) (quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860-62 (11th Cir. 2020) (per curiam)).

Here, Ponzoli contends that the progressive disciplinary steps that TCSG took against her in response to complaints about Ponzoli's unprofessional behavior from staff members, students,

and an outside vendor constitute actionable retaliatory harassment. As the Court explained above, Ponzoli has not established a causal link between this conduct and her sex discrimination complaint. Indeed, other than her suggestion that she had never been disciplined until after she reported sex discrimination, she has not pointed to evidence of any causal relationship between her complaints and TCSG's discipline of her. Her argument ignores the fact that TCSG did not receive complaints about Ponzoli's misconduct until after she reported that she was subject to sex discrimination. And even if she had shown a causal link, she has failed to show that TCSG's proffered nonretaliatory reasons were pretextual. *Debe v. State Farm Mut. Auto. Ins.*, 860 F. App'x 637, 640 (11th Cir. 2021) (per curiam) (explaining that retaliatory harassment claims are analyzed like traditional retaliation claims based on adverse employment actions). Accordingly, the Court grants summary judgment on Ponzoli's retaliatory hostile work environment claim.

### CONCLUSION

For the foregoing reasons, the Court grants TCSG's motion for summary judgment (ECF No. 38).

IT IS SO ORDERED, this 23rd day of October, 2023.

S/Clay D. Land
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA